UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

WILLIAM DOUGLAS CARROLL *ET*
*AL.*,

Appellants,

No. 3:16-CV-00218-JWD-RLB

VERSUS

SAMERA L. ABIDE,

Appellee.

**<u>RULING AND ORDER ON APPEAL OF ORDER AND MEMORANDUM OPINION
ISSUED BY THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE
DISTRICT OF LOUISIANA</u>**

**I.      <u>INTRODUCTION</u>**

Before the Court is the Appeal of the Memorandum Opinion of the United States

Bankruptcy Court for the Middle District of Louisiana, Case No. 08-10756, ("Appeal"), (Doc.

5),[1] filed by Mr. William D. Carroll, Jr. ("William") and Mrs. Carolyn K. Carroll ("Carolyn"), as

well as Mses. Cynthia G. O'Neal ("Cynthia") and Pamela K. Alonso ("Pamela") (collectively,

"Carrolls," "Debtors," or "Appellants"), who have expanded their central arguments for reversal

in the Motion for Relief from Bankruptcy Court Order Labelling the Appellants as Vexatious

Litigants and $49,432 Sanctions Against William D. Carroll, Jr. and Carolyn K. Carroll

Personally ("Motion for Relief"), (Doc. 7), and a substantively identical Motion to Reverse a

---

[1] The Notice of Appeal is Document Number 1, and the full record appears in Document
Number 4. Most, if not quite all, of the Appellant's substantive contentions appear in the Appeal.

Bankruptcy Court Order Issued March 16, 2016 Against William D. Carroll, Jr., and Carolyn K. Carroll, Pamela K. Alonso and Cytnhia (sic) G. O'Neal Based Upon Appellee, Samera A. Abide's Failure to File a Timely Reply Brief Pursuant to FRBP Rule 8009 (a)(2) ("Motion to Reverse"), (Doc. 11).[2] Ms. Samera A. Abide ("Abide," "Trustee," or "Appellee"), in her capacity as the trustee ultimately appointed to administer the estate created by the Debtors' filing of a voluntary petition for relief ("Petition") pursuant to Chapter 13[3] of United States Code's eleventh title ("Bankruptcy Code" or "Code"),[4] has opposed the Appeal with the Brief of Appellee, Samera L. Abide ("Appellee's Brief"). (Doc. 9.) Separately, she has responded to the Motion for Relief and Motion to Reverse with, among other documents, the Appellee's Memorandum in Opposition to Motion for Relief from Bankruptcy Court Order Labelling the Appellants as Vexatious Litigants and $49,432 Sanctions Against William D. Carroll, Jr. and Carolyn K. Carroll Personally [Doc. 7] ("Appellee's Memorandum"), (Doc. 8), and Appellee's Memorandum in Opposition to Appellant's Motion for District Court to Reverse a Bankruptcy Court Order Dated March 16, 2016 [Doc. 11] ("Opposition to Appeal"), (Doc. 13).[5] In the Carrolls' long-running saga, this appeal is but the latest one filed by Appellants.

---

[2] In substance, moreover, this motion is identical to yet one more filing made by Appellants. (*Compare* Doc. 11, *with* Doc. 10.)

[3] The case was subsequently converted to a Chapter 11 and then a Chapter 7.

[4] In this ruling and order ("Ruling"), the specific provisions of the Bankruptcy Code, set forth in 11 U.S.C. §§ 101–1532 inclusive, are referred as "Section _" or "§ _" unless otherwise noted.

[5] Plaintiffs' filing of two similar motions prompted Appellee's filing of two similar oppositions. Tellingly, one more filing—Appellee's Memorandum in Opposition to Appellant's Motion to Strike [Doc. 10], (Doc. 12)—directly responds to one more motion filed by Appellants whose central arguments echo the Motion for Relief and Motion to Reverse, (*Compare* Doc. 10, *with* Docs. 7, 11).

At the heart of this morass of crisscrossing and multiplying filings tendered by Appellants and Appellee (collectively, "Parties"), one question lies:[6] whether this Court should reverse the Order ("Order"), (Doc. 746, No. 08-bk-10756[7]), as supported by a lengthy Memorandum Opinion ("Opinion"), (Doc. 747, No. 08-bk-10756),[8] of the Honorable Douglas D. Dodd of the United States Bankruptcy Court for the Middle District of Louisiana ("Bankruptcy Court"), rendered on March 16, 2016.  This Order, issued pursuant to 28 USC §1651 ("All Writs Act")[9] and §105, sanctioned Appellants due to their history of vexatious and frivolous litigation for nearly fifteen years. Specifically, in the Order, the Bankruptcy Court enjoined Appellants and "anyone acting on their behalf from filing any pleading or document in this case or its associated cases or adversary proceedings, and from filing any future cases in th[e] Bankruptcy C]ourt, without first obtaining . . . [its] permission." (Doc. 1-2 at 21–22.) It also sanctioned William and Carolyn personally for $49,432 in attorneys' fees spent by the Trustee on defending two motions and one complaint. (*Id.*)

In brief, Appellants argue that, though mistakes were made, no bad faith ever animated their actions, and the Order must be reversed so as to avoid potential harm to Pamela and Cynthia as well as the imposition of harsh and burdensome monetary sanctions on William and Carolyn. Conversely, Appellee maintains that the record and well-settled law compels this Court

---

[6] As discussed later in this Ruling, this Appeal specifically raises three issues, each a cited reason for reversal. *See infra* Part II.B.

[7] In this ruling and order ("Ruling"), docket numbers will be appended only to citations to documents filed in other matters and cases.

[8] Both the Order and Opinion also appear as part of the record docketed on appeal. (Doc. 1-2.)

[9] In this Ruling, references to "Section 1651" or "§ 1651" are to this particular provision of the United States Code.

to affirm, the Appellee having been bombarded with abusive and bad-faith filings for more than

a decade.

In light of a well-documented history and ample precedent, this Court discerns no error in

the Bankruptcy Court's factual findings and concurs with its legal analysis. For more than a

decade, Appellants have sought to invoke the Code's protection from sundry creditors. Yet, for

more than a decade, by means of endless filings in multiple courts, they have attempted to evade

many of the obligations imposed upon those who pursue a fresh start, the Code's greatest

privilege. Such proven misconduct, when its motivating obstreperousness is apparent, deprives

them of membership in "the class of honest but unfortunate debtor[s] that the bankruptcy laws

were enacted to protect." *Marrama v. Citizens Bank*, 549 U.S. 365, 374, 127 S. Ct. 1105, 1111,

166 L. Ed. 2d 956, 966 (2007). For these reasons, as more fully explained below, this Court

AFFIRMS the Order and DENIES the Motion for Relief and the Motion to Reverse.


## II.   BACKGROUND

### A.   Factual and Procedural History

Appellants filed the Petition on May 21, 2008. (Doc. 1-2 at 2; Doc. 4 at 2; Doc. 4-3 at 1;

Doc. 4-6 at 9.) The Petition was initially filed under Chapter 13 but was subsequently converted

into a Chapter 11 case on August 5, 2008, (Doc. 4 at 9; Doc. 4-6 at 9), and a Chapter 7 one on

August 27, 2008, (Doc. 1-2 at 2; Doc. 4 at 13; Doc. 4-3 at 1; Doc. 4-6 at 9). At that time, Abide

was added as trustee of the Carroll's bankruptcy estate. (Docs. 4 at 13, 4-3 at 1, 4-6 at 1.) As the

Trustee, Abide was authorized to act as attorney for the estate pursuant to 11 U.S.C. §327. (Doc.

4-1 at 1.) On July 2, 2008, RedPen Properties L.L.C., whose membership consists solely of the

Debtors, filed a Chapter 7 petition. (Doc. 4-6 at 2; Doc. 4-6 at 16.) The cases were consolidated

in October of 2014. (Doc. 4-6 at 2; Doc. 4-6 at 16.) According to the Trustee, during the course of the consolidated bankruptcy proceedings, Appellants filed a number of unnecessary and frivolous filings and appeals and conducted a number of personal attacks against her before ultimately trying to strip her of her role as trustee of the estate. (Doc. 1-2 at 4-5.) Thus, Trustee filed a Motion Seeking Relief Under 28 U.S.C. § 1651 and 11 U.S.C. §105 ("Motion for Relief"). (Doc. 4-4 at 1-2.)

In doing so, she sought a declaratory judgment finding the Appellants to be "vexatious litigants."  She also sought the imposition of sanctions prohibiting Appellants from "filing any further pleadings, complaint, motions, applications, petitions, lawsuits, and/or memoranda, in any judicial or non-judicial forum, against Samera L. Abide, individually and/or as Trustee of the estates of William D. Carroll, Jr., Carolyn Carroll, RedPen Properties, and/or any other entity owned by, or affiliated or associated with [the individuals mentioned above], without first obtaining leave of the United States Bankruptcy Court or the United States District Court, Middle District of Louisiana . . . . ." (Doc. 4-4 at 1–2.) The Appellants were served with a copy of this motion on October 5, 2015. (Doc. 4-5 at 1.) At that point, the Trustee moved for a special hearing to be set. (Doc. 4-8 at 1.) An order was issued by the Bankruptcy Court on October 5, 2015, setting the hearing for October 28, 2015 at 2:00 p.m. (Doc. 4-11 at 1.) On October 20, 2015, the Appellants filed an objection and memorandum in opposition to the Trustee's motion, serving a copy on the Trustee. (Doc. 4-27; Doc. 4-28.)

During the special hearing, in accordance with well-established precedent,[10] the Bankruptcy Court took judicial notice of "all suit records in the U.S. Bankruptcy Court and the

---

[10] Documents in judicial actions and cases' dockets are public records of which any court can take judicial notice. FED. R. EVID. 201; *Porter v. Ollison*, 620 F.3d 952, 954–55 n.1 (9th Cir.

U.S. District Court," and the consolidated bankruptcy matters. (Doc. 4 at 118.) These suits bear

the following case numbers: 08-CV-00673; 08-CV-00728; 08-CV 00788; 08-CV-01110; 08-

01132, 09-00120; 11-00437; 11-00368; 11-00684, 11-00702; 12-00637; 14-00637; 14-00503;

15-00508; 15-0106708; 08-10756; and 08-10933. (*Id.*) Following the special hearing, a Post-

Hearing Memorandum was submitted by the Trustee and her special counsel, Mr. Steven Paul

Lemoine ("Lemoine"), in support of the Motion for Relief. (Docs. 4 at 119, 4-25 at 1-47.)

Having offered no new evidence during the special hearing itself, the Debtors filed a Post

Hearing Memorandum in Opposition on December 11, 2015. (Doc. 4-27 at 1–116.)

On February 25, 2016, the Bankruptcy Court entered an order granting the Motion for

Relief. (Doc. 4 at 120.) On March 16, 2016, that court issued the Memorandum and Order. (Doc.

1-2 at 1; Doc. 1-3 at 1-2; Doc. 1-4 at 1; Doc. 4 at 120; Doc. 4-34 at 1.) The court reasoned that

"the ensuing months and years saw [Appellants'] relentless and invariably unsuccessful attempts

to prevent creditors from reaching their assets through an astounding number of unnecessary

filings—many of them duplicative—both in [the bankruptcy court] and also the United States

District Court for the Middle District of Louisiana." (Docs. 1-2 at 2, 4-33 at 2.) Having so

concluded, the Order declared the Appellants "vexatious litigants" and enjoined them from filing

any pleading or document absent the permission of the court. (Doc. 1-2 at 1; Doc. 1-3 at 1-2;

Doc. 1-4 at 1; Doc. 4 at 120; Doc. 4-34 at 1.) In addition, it imposed on William and Carolyn a

pecuniary sanction in the amount of $49,432 to be paid to the Trustee for violation of § 105.

(Doc. 1-4 at 1; Doc. 4 at 120; Doc. 4-34 at 1.) In assessing these sanctions, the Bankruptcy Court

recounted the following facts, each one supported by an expansive and extensive record.

---

2010); *Wilson v. McVey*, 579 F. Supp. 2d 685, 688 (M.D. Pa. 2008); *United States v. Wilson*, 631
F.2d 118, 119 (9th Cir. 1980).

*1.*     *Sales Related to 5-Acre Track*

In September of 2008, the Trustee petitioned for permission to sell property belonging to a limited liability company owned by the Carrolls. (Doc. 1-2 at 5; Doc. 4-33 at 5.) The sale was approved; however, the Carrolls appealed the sale order. (Doc. 1-2 at 5; Doc. 4-33 at 5.) Although the meritless appeal was later dismissed, it caused significant delay, which ultimately resulted in the abandonment of the transaction. (Doc. 1-2 at 5; Doc. 4-33 at 5.) The property sold at auction for roughly five hundred and ninety thousand dollars ($590,000) less than the original price. (Doc. 1-2 at 5; Doc. 4-33 at 5.)

*2.*     *Movables Adversary Proceeding*

In September of 2009, Pamela and Cynthia, the daughters of William and Carolyn, filed suit seeking to be declared owners of movables located at their parents' residence. (Doc. 1-2 at 5; Doc. 4-33 at 5.) They claimed that ownership of the movable property had been formally transferred to them prior to the filing of the bankruptcy case and the initiation of the bankruptcy proceedings. (Doc. 1-2 at 5; Doc. 4-33 at 5.) Thus, the property was inaccessible to any of the estate's creditors. (Doc. 1-2 at 6; Doc. 4-33 at 6.) The parties were ordered to move to withdraw the suit to the United States District Court for the Middle District of Louisiana ("District Court"). (Doc. 1-2 at 6; Doc. 4-33 at 6.)

Prior to the termination of this matter, the Trustee was forced to move for Appellants to be held in contempt. (Doc. 1-2 at 7; Doc. 4-33 at 7.) The District Court found the Carrolls to be in contempt of court as a result of violating a judicial order directing them to hand over certain documents to the Trustee. (Doc. 1-2 at 7; Doc. 4-33 at 7.) As such, the District Court assessed all

costs and fees associated with the motion for contempt to Debtors and ordered them to vacate their home. (Doc. 1-2 at 7; Doc. 4-33 at 7.) In the end, all of the Appellants' subsequent motions, including a Motion to Stay Pending Appeal, Motion to Vacate the August 13, 2013 contempt order, Motion to Strike the Second Motion for contempt, and a Motion for Relief from Sanctions, proved unsuccessful, and the Appellants' arguments were found generally meritless. (Doc. 1-2 at 7; Doc. 4-33 at 7.) One last fact was noted: for whatever reason, Appellants failed to pay Trustee the requisite monetary sanctions, leading the Trustee to file a second contempt motion. (Doc. 1-2 at 8; Doc. 4-33 at 8.)

### 3.      *Sale of Carrolls' Residence*

In March of 2011, the Trustee asked the Bankruptcy Court to compel the Carrolls to vacate their residence in light of its imminent potential sale. (Doc. 1-2 at 8; Doc. 4-33 at 8.) Although the Bankruptcy Court allowed the Carrolls to remain in the home conditioned on the payment of insurance and real estate taxes, it ordered them to refrain from interfering with any viewings or inspections of it. (Doc. 1-2 at 8; Doc. 4-33 at 8.) The Carrolls promptly appealed this order, even as the Trustee's motion for the sale of the residence was granted on August 26, 2011. (Doc. 1-2 at 8; Doc. 4-33 at 8.) The Carrolls not only appealed this order as well but also moved for reconsideration. (Doc. 1-2 at 8; Doc. 4-33 at 8.) Although both motions failed, the Carrolls continued to file documents, pleadings, and appeals in an attempt to delay the sale of the residence at auction. (Doc. 1-2 at 8; Doc. 4-33 at 8.)

### 4.    *Sale of Movables*

In August of 2014, Trustee moved to sell the movables previously declared by the District Court to be property of the estate. (Docs. 1-2 at 9; Doc. 4-33 at 9.) Among other reasons, the Appellants objected to the auction's proposed procedure and sought to force the Trustee to abandon certain immovable property due to their asserted lack of value. (Doc. 1-2 at 10; Doc. 4-33 at 10**.)** These objections were overruled, and Appellants' motions were dismissed. (Doc. 1-2 at 10; Doc. 4-33 at 10.)

When the Debtors attempted to establish Alonso and O'Neal's ownership of the movable property located at their residence and thereby place them out of reach of the bankruptcy estate failed , the Carrolls claimed exemption of the movable property under § 522(f). (Docs. 1-2 at 13, 4-33 at 13.) On September 28, 2011, the Trustee filed an objection to this exemption. (Doc. 1-2 at 13; Doc. 4-33 at 13.) The Bankruptcy Court ordered the Carrolls to amend their Schedule B and C "to more accurately and specifically identify the number and nature" of the movables located in the residence. (Doc. 1-2 at 13; Doc. 4-33 at 13.) The hearing regarding the exemption was set for February 10, 2012; however, the ruling was delayed in light of pending litigation involving the relevant movables. (Doc. 1-2 at 13; Doc. 4-33 at 13.) On June 27, 2013, the court granted summary judgment in favor of the Trustee in the aforementioned litigation, and in doing so held that the movable property was property of the consolidated bankruptcy estates. (Doc. 1-2 at 13; Doc. 4-33 at 13.) However, no distinction was made between the property of the Carrolls' estate or the RedPen Properties' estate. (Doc. 1-2 at 13; Doc. 4-33 at 13.)

**5.**     ***Consolidation Related Filings***

On July 16, 2014, the Trustee moved to consolidate the Carroll and the RedPen Properties' estates. (Doc. 1-2 at 12; Doc. 4-33 at 12.)The Trustee argued that the two estates were so "entangled that the assets and liabilities were virtually identical." (Doc. 1-2 at 12; Doc. 4-33 at 12.) Having waded through the record in both cases, the Bankruptcy Court approved the consolidation over the objections of the Carrolls. (Doc. 1-2 at 12; Doc. 4-33 at 12.) This consolidation was not appealed. (Doc. 1-2 at 12; Doc. 4-33 at 12.)

**6.**     ***Filings Related to Exemptions and Injunction Request***

On September 3, 2013, the Carrolls filed a Motion for Personal Effects to collect their belongings and a Motion to Stay to prevent the sale of the movables before appeal of the District Court decision. (Doc. 1-2 at 14; Doc. 4-33 at 14.) In support of the Motion to Stay, the Carrolls alleged that the Trustee and her counsel had "committed illegal searches, intentionally violated the Federal Rules of Civil Procedure, violated federal bankruptcy trustee regulations, committed malfeasance in office, violated direct court orders, violated HIPPA, and committed perjury and fraud in the public record." (Doc. 1-2 at 14; Doc. 4-33 at 14.) The Motion for Personal Effects was denied on September 6, 2013, and the Motion to Stay was similarly denied three days later. (Doc. 1-2 at 14; Doc. 4-33 at 14.)

Subsequently, after the the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit") affirmed the District Court ruling in regard to the movable property, the Bankruptcy Court took up the issue of exemption as to those movables. (Doc. 1-2 at 14-5; Doc. 4-33 at 14-5.) The Trustee's objection to the exemption was sustained on March 30, 2015. (Docs. 1-2 at 15; Doc. 4-33 at 15.) The court denied a Motion for Reconsideration filed by the Carrolls and

ordered the retrieval of exempt property. (Doc. 1-2 at 15; Doc. 4-2 at 1; Doc. 4-33 at 15.) In doing so, the Bankruptcy Court clarified that "wedding and engagement rings, clothing and the 1997 Mercedes automobile claimed on the original Schedule C filed on June 13, 2008 as part of the P-16 [were] exempt [,] as well as the therapy equipment claimed on the amendment to Schedule C filed as part of the P-256." (Doc. 4-2 at 1.)

On June 1, 2015, the Trustee's Motion to Appoint an Auctioneer and Motion to Sell the property were granted. (*Id.*) In August of the same year, the Trustee filed a Notice of Proposed Sale Free and Clear Through Public Auction. (*Id.*) In response, the Carrolls filed a motion to temporarily restrain the sale of the property and a Motion for Preliminary Injunction (*Id.*) The Carrolls appealed the denial of both motions in conjunction; concurrently, they filed a motion to stay pending the appeal. (Doc. 1-2 at 16; Doc. 4-33 at 16.) The District Court denied the stay and dismissed the appeal. (Doc. 1-2 at 16; Doc. 4-33 at 16.) The property was sold as intended on December 13, 2015 without further appeal. (Doc. 1-2 at 16; Doc. 4-29 at 1; Doc. 4-33 at 16.) However, the Carrolls did seek dismissal of the Trustee's claim for injunctive relief in December of 2015. (Doc. 1-2 at 16; Doc. 4-33 at 16.)


### 7.        *Attempts to Remove Trustee*

On two separate occasions during this litigation, the Carrolls sought to remove the Trustee. (Doc. 1-2 at 10; Doc. 4-33 at 10**.**) Appellants filed their first such motion in March of 2011. (Doc. 1-2 at 11; Doc. 4-33 at 11.) For support, they relied on Carolyn's testimony in regard to prior allegations stemming from the bankruptcies of Charis Hospital, L.L.C. and Charis Partial Hospital, Inc. in 2001 and Stacy Calvaruso in 1998. (Doc. 1-2 at 11; Doc. 4-33 at 11.) The court found there to be insufficient evidence to warrant removal of the Trustee. (*Id.*) The Carrolls

appealed, but that appeal was eventually withdrawn. (Doc. 1-2 at 11; Doc. 4-33 at 11.) On

September 10, 2014, the Appellants filed their second such motion. (Doc. 1-2 at 11; Doc. 4-33 at

11.) In addition to the previous grounds of removal, the Appellants alleged gross

mismanagement of estate funds. (Doc. 1-2 at 12; Doc. 4-33 at 12.) The Bankruptcy Court denied

this second motion on November 21, 2014 reasoning that any procedural delay was not due to

the fault of the Trustee. (Doc. 1-2 at 12; Doc. 4-33 at 12.)


**B.    Parties' Arguments**

*1.    Appellants' Side*

Recognizing that this case's determination rides upon the meaning of § 1651 and § 105,

the Carrol's open the Appeal with an acknowledgement: "[We] don't deny the legal course of

events extending over a period of fifteen years" that "has created a . . . [series] of contentious

relationships between the various parties." (Doc. 5 at 8.) In spite of this statement, Appellants

proceed to recount their version of the events painstakingly recapitulated by the Bankruptcy

Court and echo arguments resolved against them long ago, (*See, e.g.*, Doc. 4, No. 3:15-cv-00508-

JWD-SCR; Doc. 50, No. 2:14-cv-00503-BAJ-EWD).

Thus, they cast blame on the Trustee's "lack of interest" in pursuing the Carrolls' action

against the Internal Revenue Service and deride the debt as "grossly inflated." (*Id.* at 8–9.) At "a

final bankruptcy court hearing . . . in the spring of 2012," they add, "Abide reported there was no

fraud[,] just some civil issues." (*Id.*) They direct the Court to one of their own filings in the

Bankruptcy Court, for "document[ation of] a variety of issues . . . Abide committed against the

Carroll's [sic], causing them harm." (*Id.* at 12; *see also* Doc. 739, No. 08-bk-10756.) Yet, though

this motion too is filled with similarly general allegations, they concurrently deride Abide's

memorandum as "forty-seven (47) pages of allegations . . . but essentially nothing new." (Doc. 5 at 11, 15; *see also* Doc. 737, No. 08-bk-10756.)

Once more, they attack the auction authorized by this Court's September order, (Doc. 4, No. 3:15-cv-00508-JWD-SCR), contending that they had found a certain buyer willing to pay far more for their goods than the auction netted. (Doc. 5 at 12–13.) Indeed, by their reckoning, "the aggregate loss to the estate" totaled $120,841.57. (*Id.* at 14.) They point to a single sentence— "There was no evidence offered"—in the Bankruptcy Court's minute entry as to the hearing held on October 28, 2015, regarding the sanctions to be imposed, (Doc. 730, No. 08-bk-10756), and characterize the Bankruptcy Court as having "opined about the issues and made generalized statements about . . . [its] inability to take such actions as demanded by . . . Abide's attorney," (Doc. 11 at 11, 15).[11]

In their pleading, Appellants launch one last fusillade against Abide. Specifically decrying her for "working with attorneys for . . .[a] bank against the Carroll[s]" in one matter and thereby sacrificing a case that "could have easily [been] won," they paint her as a "wolf at the door" who has "consistently worked against them." *Id.* at 15–16 (internal quotation marks omitted).) She has failed to "help[] save the Carroll[s'] assets and . . . the courts['] . . . time and expense," so that this case's slow resolution must be blamed mostly on her own imperfect actions. (*Id.* at 15–16.)

Scattered throughout this history and in the Appeal's final pages are Appellants' arguments for reversal, apparently four in number. First, as their recitation implies, Appellants see their actions as no more than innocent mistakes. (*Id.* at 17.)  Their choices, including their

---

[11] Though they were "desirous" of a transcript so as to confirm these impressions, a lack of funds has stymied them. (Doc. 11 at 15.)

multiple appeals and innumerable motions, do not evidence punishable deceit or obstreperousness; instead, they attest to the Carrols' firm (and rightful) belief "in standing up against bullies and fighting for their rights." (*Id.* at 15 (internal quotation marks omitted).) So motivated, their behavior should not be so severely punished on the basis of the "partially correct," "blatantly incorrect," and "embellish[ed]" allegations against the Carrolls advanced by Abide and incorporated by the Bankruptcy Court into its Opinion. (*Id.* at 16–17.) In their eyes, they "tried to do the right thing," and, acting as their own attorneys, made statements with a good-faith belief in their veracity. (*Id.* at 15, 17.) By such vague means, Appellants attempts to attack the Bankruptcy Court's factual findings. (*Id.*; *see also* Doc. 9 at 16–17.)

Second, Appellants contend that the $49,432 assessed against William and Carolyn personally amounts to an impermissible double-charge. Per the Opinion, "[t]he [Bankruptcy C]ourt had granted fee applications for . . . Abide and . . . Lemoine[, her counsel,] that included the fees incurred in the defense of the actions cited above on October 29, 2015." (Doc. 746 at 22 n.64, No. 08-bk-10756.) As Appellants read this footnote, "the attorney's fees of . . . Abide and her attorney have already been included in the estate approval fees up through the October 28, 2015 hearing." (Doc. 5 at 18.) Seemingly, "three (3) defense actions were stated and included" within the footnote, and "[s]ince . . . Abide and her attorney have been included, the Carroll[s] should not have to pay them personally." (*Id.*)

Third, Appellants maintain their daughters' noninvolvement in the present dispute. In their words, even though William and Carolyn had "obviously" become "vexatious litigants" from 2012 to 2015 and subject to punishment pursuant to § 105, Pamela and Cynthia were never "under the jurisdiction of the [B]ankruptcy [C]ourt" and "therefore . . . are not subject to the imposition of" the Order. (*Id.* at 9, 10.) Rather, neither daughter has "been involved in the

[B]ankruptcy [C]ourt in a legal capacity since September 2011." (*Id.* at 18.) Despite this allegedly flimsy connection, the Order threatens to "potentially harm them and their families" due to their employment "in professional positions in the Prairieville and Baton Rouge area." (*Id.* at 19.)[12]

Fourth, Appellants stress their family's precarious condition. In their seventies, William and Carolyn are "senior citizens" who have "already experienced health problems as a result of these prolonged issues . . . ." (*Id.* at 16, 18, 19.) They have "literally been reduced to . . . poverty" and have "no assets." (*Id.* at 16, 18.) They now survive on "less than $2,000 monthly with a 15% IRS garnishment." (*Id.* at 18.) In sum, they are so poor that the Order imposes upon them "a cruel and burdensome pecuniary sanction," its "egregious[ness]" therefore manifest. (*Id.* at 19.)

### 2.    *Appellee's Position*

In the Appellee's Brief, Abide attacks the Appeal in three ways.

First, declaiming any desire to "repeat what the . . . Opinion . . . so concisely and painstakingly set forth []or distill the relevant facts any further in fear of leaving anything out," Appellee defends the Bankruptcy Court's factual findings. (Doc. 9 at 15.) Thus, she points out that the Bankruptcy Court took judicial notice of the substantial record of sixteen different cases, but that the Appellants offered no contrary evidence or raised any objection to such notice being taken. (*Id.* at 15–16; *see also* Doc. 5 at 8.) Furthermore, in the Appeal itself, William and Carolyn described themselves as "vexatious litigants." (Doc. 9 at 15–16; *see also* Doc. 5 at 8.) Because Appellants have thereby "failed to introduce any evidence to contradict or even cast

---

[12] Without explanation, Appellants reference a son uninvolved in their bankruptcy proceedings. (Doc. 5 at 15.)

shade on any of the notable actions in the [B]ankruptcy [C]ourt along with the . . . filings that undermine each of those notable actions," that court's factual findings cannot be disturbed. (Doc. 9 at 16 (internal quotation marks omitted).) Appellants have simply "failed to successfully establish that the [B]ankruptcy [C]ourt clearly erred in reaching these findings of fact," and this Court must affirm as "it is not . . . [its] function . . . to determine whether or not it might have drawn different inferences from the facts." (*Id.* at 16–17.) This Court may only "ascertain whether plausible evidence exists to support the [B]ankruptcy [C]ourt's findings," and Appellants' failure now sets them all "in stone." (*Id.* at 17.)

Second, based on these findings, § 1651 and § 105, as written and construed, provided sufficient statutory authority for the Order. (*Id.* at 17–18.) As the record reveals, all the notable actions attributed to Appellants by the Bankruptcy Court, *see supra* Part II.A, "prove they spent enormous amounts of time and effort and a considerable amount of money filing a high-volume of pleadings; some nonsensical, many false, many repetitive, and almost all frivolous and/or antagonistic and vicious . . . ." (Doc. 9 at 18.) "[P]atently false statements, often trumped up to cast [A]ppellee in a negative light," littered their papers. (*Id.* at 19.)

As one recent example, Appellee directs this Court to the Carrolls' assertion regarding their daughters' noninvolvement as parties since 2011, (Doc. 5 at 18), and observes that the case in which these children were named plaintiffs has not yet concluded. (Doc. 9 at 19.) Indeed, "[a]s recently as April 27, 2016, the [D]istrict [C]ourt issued a ruling against the [A]ppellants regarding sanctions they had been ordered to pay." (*Id.*) Pamela and Cynthia, then, "are still in the bankruptcy courts," signing off on "countless pleadings," as other filings conclusively demonstrate. (*Id.* at 19–21.) As such, whatever protestations are now made by William and Carolyn, "the reality is that all [of the Appellants] are guilty of having conspired to shield the

debtors' assets from creditors, while taking no prisoners." (*Id.* at 21 (internal quotation marks omitted).)

Viewed as a whole, "it was clear to the [B]ankruptcy [C]ourt that [A]ppellants were utilizing the [B]ankruptcy [C]ourt to shield debtors' assets from creditors and, in furtherance of that scheme, directed vicious and *ad hominem* attacks against the [A]ppellee who [A]ppellants believed was standing in their way." (*Id.* at 22.) They have "abuse[d] the opportunities afforded by the legal system," thereby "deflect[ing]" much "valuable time and [many] resources . . . from cases in need of attention." (*Id.* at 23.) "[B]ad faith filings" have proliferated here, as have "offensive language" and pleadings so "acrimonious" as to trigger judicial review, with Abide herself personally targeted.  (*Id.* at 25, 27–28.) Again and again, in the course of their "vicious and mean-spirited attacks," Appellants have been "unrestrained by truth." (*Id.* at 30.) For more than a decade, Appellants have malformed the legal system into "a vehicle for harassing actions at the expense of others" by means of "abusive and vexatious litigation tactics." (*Id.* at 23, 27–28.) Due to this history, no doubt can be raised about the Bankruptcy Court's power to punish such conduct under § 105 and § 1651 and by virtue of every court's inherent authority.

Third, Appellees defend the conservatism of the Order. (*Id.* at 31.) The Bankruptcy Court "determined that . . . almost all of the [A]ppellants' actions described in its [O]pinion were abusive, harassing, or in bad faith." (*Id.*) Yet, Pamela and Cynthia "escaped monetary sanctions," and William and Carolyn "were only sanctioned in connection with the costs associated with the two motions to remove the trustee and the complaint the Carolls filed to enjoin the sale of the movables." (*Id.*) The Appellants' evidentiary failings as to these two motions and one complaint easily justified the assessed monetary sum. (*Id.* at 31–33.) As its fair reading discloses, it was not

a double-charge, as Appellants contend, but a fee for the extra work necessitated by Appellants' latest frivolous forays. (*Id.*)

### 3.       *Final Dispute: Applicability of Rules*

Separately from their Appeal, the Appellants maintain that reversal must follow because the Appellee's Brief was not timely filed. According to Appellants, pursuant to Rule 8006(a)(1), Appellee owed a response to their appeal within fourteen days of the "designation of items to be included in the record on appeal and a statement of the issues to be presented." (Doc. 7 at 1; *see also* Doc 10 at 1–2; Doc. 11 at 1.) Admittedly, Appellee was allotted time after service to file an additional designation per Rule 8006, but she was required to file her brief within fifteen days of the entry of notice of appeal in accordance with Rule 8009(a)(1). (Doc. 7 at 1; *see also* Doc. 11 at 2.) As she did not do so, Appellants demand reversal of the Order. (*Id.* at 2; *see also* Doc. 11 at 2–4.) As a counter, Appellee maintain that Rule 8009, contrary to Appellants' view, contains a different applicable deadline, one of thirty days. (Doc. 13 at 2.) That deadline, Abide concludes, was met.

## III.   DISCUSSION

### A.   Jurisdiction and Standard of Review

This Court's subject-matter jurisdiction is based upon 28 U.S.C. § 1334. The Bankruptcy Court's "factual findings are reviewed for clear error; its legal conclusions and mixed questions of fact and law[] de novo." *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 402 (5th Cir. 2001). Nevertheless, the clear error standard does not apply to findings of fact resulting from application of an incorrect legal standard. *See Fabricators, Inc. v. Technical*

*Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1464 (5th Cir. 1991) (relying on

*Wilson v. Huffman (In re Missionary Baptist Found. of Am., Inc.)*, 712 F.2d 206, 209 (5th Cir.

1983)).

## B.    Relevant Law

"No one, rich or poor, is entitled to abuse the judicial process." *Green v. Carlson*, 649

F.2d 285, 287 (5th Cir. 1981); *see also, e.g.*, *United States v. Peach*, 533 F. App'x 853, 854 (10th

Cir. 2013); *Tripati v. Beaman*, 878 F.2d 351, 353 (10th Cir. 1989). For all the veneration it

elicits, the right of access to the courts is thus "neither absolute nor unconditional." *In re Green*,

669 F.2d 779, 785 (D.C. Cir. 1981); *see also Hardwick v. Brinson*, 523 F.2d 798, 800 (5th Cir.

1975). There exists "no constitutional right of access to the courts to prosecute . . . action[s] that

[are] frivolous or malicious" even by *pro se* litigants, *Cauthon v. Rogers*, 116 F.3d 1334, 1337

(10th Cir. 1997); *see also, e.g.*, *Stine v. U.S. Fed. Bureau of Prisons*, 465 F. App'x 790, 796

(10th Cir. 2012).

"[F]rivolous appeals in light of previous warnings merit the imposition of sanctions."

*Bansal v. Acosta*, 117 F. App'x 372, 373 (5th Cir. 2005); *see also, e.g.*, *Freeze v. Griffith*, 849

F.2d 172, 176 (5th Cir. 1988); *Green v. Carlson*, 649 F.2d 285, 287 (5th Cir. 1981). And

"injunctions are proper where the litigant's abusive and lengthy history is properly set forth" in

detail sufficient to allow a pattern to be discerned. *Tripati*, 878 F.2d at 353 (collecting cases). In

such cases, a court may invoke either its inherent power or § 1651(a)[13] to enjoin litigants who

---

[13] Section 1651(a) reads: "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). Very often, if not always, § 1651 is described as providing district courts with "the inherent power to enter pre-filing orders against vexatious litigants," though the very term "inherent power" suggests no need for such a statutory anchor. *See Weissman v. Quail Lodge Inc.*, 179 F.3d 1194, 1197 (9th Cir. 1999). Regardless,

abuse the court system by harassing their opponents or engage in the most vexatious of practices. *Harrelson v. United States*, 613 F.2d 114, 116 (5th Cir. 1980); *accord Newby v. Enron Corp.*, 302 F.2d 295 (5th Cir. 2002); *Farguson v. MBank Houston*, 808 F.2d 358, 359 (5th Cir. 1986); *see also, e.g.*, *Cotner v. Hopkins*, 795 F.2d 900, 902–03 (10th Cir. 1986); *In re Oliver*, 682 F.2d 443, 445 (3d Cir. 1982). "[A]n extreme remedy that should rarely be used," certain misconduct compels invocation of § 1651, since "[f]lagrant abuse of the judicial process cannot be tolerated" so as to "enable [a litigant] . . . to preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants." *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1057 (9th Cir. 2007).

In the bankruptcy context, one more statute can be said to authorize such punishments. Section 105 allows a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Code, including those necessary "to prevent an abuse of process." 11 U.S.C. § 105(a). Though "[t]he power contained in §105 is arguably more extensive than that contained in" § 1651, *In re Howell*, 4 B.R. 102, 105 (Bankr. M.D. Tenn. 1980), it has also been described as "merely a restatement in the bankruptcy context of" that very statute, *Regency Realty Assocs. v. Howard Fertilizer, Inc. (In re Regency Realty Assocs.)*, 179 B.R. 717, 719 (Bankr. M.D. Fla. 1995). Whatever the two statutes' relationship, as one appellate court opined, "the plain language of § 105 furnishes the bankruptcy courts with ample authority to sanction conduct that abuses the judicial process, including conduct that unreasonably and vexatiously multiplies bankruptcy proceedings." *In re Volpert*, 110 F.3d 494, 501 (7th Cir. 1997). Like the interpretation of other Code sections, such a decision must pay heed to

---

courts should always first rely on written law rather than any amorphous concept of inherent authority. *See* Chambers v. NASCO, Inc., 501 U.S. 32, 50, 111 S. Ct. 2123, 2136, 115 L. Ed. 2d 27, 48–49 (1991).

bankruptcy law's animating purposes. *See, e.g.*, *Tower Credit, Inc. v. Schott*, 550 B.R. 299, 306 (M.D. La. 2016); *Stern v. Am. Home Mortg. Servicing, Inc. (In re Asher)*, 488 B.R. 58, 65 (Bankr. E.D.N.Y. 2013).

Regardless, pursuant to § 105 and/or § 1651,[14] bankruptcy courts, as courts established by Act of Congress, possess the power to regulate vexatious litigation. *Goodman v. Cal. Portland Cement Co. (In re GTI Capital Holdings, LLC)*, 420 B.R. 1, 11 (Bankr. D. Ariz. 2009). Within the Fifth Circuit, "[i]n determining whether it should impose a pre-filing injunction or should modify an existing injunction to deter vexatious filings, a court must weigh all the relevant circumstances." *Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008). Four factors must be specifically considered: "(1) the party's history of litigation, in particular whether he has filed vexatious, harassing, or duplicative lawsuits; (2) whether the party had a good faith basis for pursuing the litigation, or simply intended to harass; (3) the extent of the burden on the courts and other parties resulting from the party's filings; and (4) the adequacy of alternative sanctions." *Id.* (citing to *Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 818 (4th Cir. 2004)).[15]

### C.    Application

In painstaking detail, with citations to supporting portions of the record and a plethora of documents, the Bankruptcy Court recounted a Chapter 7 proceeding repeatedly impaired by

---

[14] A bankruptcy court's sanction can also be predicated on Federal Rule of Bankruptcy Procedure 9011. FED. R. BANKR. P. 9011. In general, this rule is construed similarly to Federal Rule of Civil Procedure 11. In this Ruling, any and all references to "Rule" or "Rules" are to the Federal Rules of Bankruptcy Procedure unless otherwise noted.

[15] Notice and a hearing are also required if the district court sua sponte imposes a pre-filing injunction or sua sponte modifies an existing injunction to deter vexatious filings. Neither party disputes that such notice and hearing occurred here.

Appellants' multiple—and fruitless—appeals along with repeated—and invariably legally insufficient—motions. The dockets in nearly sixteen separate cases evidence this pattern of delay and obstruction with unambiguous clarity, as but three examples show. On March 11, 2016, the Honorable Brian A. Jackson dismissed the latest appeal filed by the Carrolls, finding no merit in a single argument propounded, *Carroll v. Abide*, No. 14-00503-BAJ-EWD, 2016 U.S. Dist. LEXIS 31546, 2016 WL 1048992 (M.D. La. Mar. 11, 2016), and having previously expressed "serious doubts as to the legal *and* factual bases of their claims" based on the "record to date," *Carroll v. Abide*, No. 14-00503-BAJ-EWD, 2014 U.S. Dist. LEXIS 141053, at *3, 2014 WL 4929539, at *1 (M.D. La. Oct. 1, 2014) (emphasis in original).[16]

Months earlier, on September 11, 2015, this Court dismissed the Carrolls' appeal for their failure to satisfy the requirements set forth in Rule 8002 and found their standing to sue entirely "uncertain" and their factual contentions wholly unsupported. *Carroll v. Abide*, No. 3:15-cv-00508-JWD-SCR, 2015 U.S. Dist. LEXIS 121006, 2015 WL 532091 (M.D. La. Sept. 11, 2015). Notably, it characterized Appellants' latest complaint as "mak[ing] a number of different inapposite allegations." *Id.* at *5–6. Nearly a year earlier, on May 20, 2014, the Fifth Circuit denied an appeal filed by Pamela and Cynthia, faulting them for "do[ing] no more than reassert[ing] the arguments they made (and the district court rejected) in the proceedings below" and "find[ing] them to be meritless." *In re RedPen Props, L.L.C.*, 568 F. App'x 338, 340 (5th Cir. 2014).

For years, then, Appellants have appealed well-founded orders issued by the Bankruptcy Court and thusly delayed (or attempted to hinder) specific actions by court or trustee which were

---

[16] While the October judgment was vacated and remanded, *Carroll v. Abide*, 788 F.3d 502 (5th Cir. 2015), the Court cites it not for the reasoning but for its observation about the Appellants' conduct.

authorized by either Code or jurisprudence. With impressive consistency, each Appellant has done so while ignoring manifest jurisdictional defects or promoting arguments having no reasonable legal basis. Such is the plain definition of a "frivolous" claim, and the certain meaning of a "vexatious litigant." *Frivolous*, *Vexatious Litigant*, BLACK'S LAW DICTIONARY (10th ed. 2014). As such, the import of the facts assembled by the Bankruptcy Court cannot be questioned, too exhaustively detailed for any error to be found.

Three other facts support this factual conclusion. As the record tells, the Appellants chose not to present evidence before the Bankruptcy Court as to this issue. (Doc. 730, No. 08-bk-10756.) Moreover, while the Appeal labels some factual allegations made by Abide and endorsed by the Bankruptcy Court as only "partially correct" or "blatantly incorrect," it concedes others' accuracy. (Doc. 5 at 16–17.) For this Court to overturn the Bankruptcy Court's factual findings, specific contrary evidence is essential. Instead of offering up the requisite counter, Appellants have granted veracity to at least some and failed to counter even one. With no specific objection or counter made, the findings' general truth has been effectively conceded. Finally, by their own admission, William and Carolyn were "vexatious litigants." (*Id.* at 9.) To affirm the Bankruptcy Court as to them, then, is to do no more than accept this characterization of their own actions.

Although its decision to do so must be reviewed *de novo*, the sanctions imposed by the Bankruptcy Court on the basis of these facts find ready support in well-established jurisprudence. The first punishment assessed—enjoining Appellants and their agents from filing any pleading or document in the main case's docket without the Bankruptcy Court's permission—has been endorsed by several courts of appeals, including the Fifth Circuit. *Baum*, 513 F.3d at 186–94); *see also, e.g.*, *Ortman v. Thomas*, 99 F.3d 807, 811 (6th Cir. 1996); *Abdul-Akbar v. Watson*, 901

F.2d 329, 332 (3d Cir. 1990); *Castro v. United States*, 775 F.2d 399, 408-10 (1st Cir. 1985);

*Lacks v. Fahmi*, 623 F.2d 254, 256–57 (2d Cir. 1980). In fact, such an approach has been favored

for preventing a person from pursuing further frivolous actions without permanently denying him

or her access to the courts. *See, e.g.*, *In re Packer Ave. Assocs.*, 884 F.2d 745, 748 (3d Cir. 1989).

As for the Bankruptcy Court's monetary sanction, the law rings just as loudly: such

sanctions may be imposed when vexatious inclinations are, as here, adequately documented

pursuant to § 105 or a court's inherent prerogative. [17] *See, e.g.*, *Caldwell v. Unified Capital Corp.*

*(In re Rainbow Magazine)*, 77 F.3d 278, 284–85 (9th Cir. 1996). Indeed, "to *not* allow a

bankruptcy court to impose attorney's fees as sanctions against those who willfully abuse the

judicial process would ignore the realities of present-day litigation and the relationship between

the court systems." *In re Volpert*, 110 F.3d at 500 (emphasis added). In this case, with

Appellants' vexatious behavior apparent and incontrovertible, both jurisprudence and statute not

only support but compel the imposition of sanctions in the manner assessed by the Bankruptcy

Court. This Court finds the sanctions issued by the Bankruptcy Court remarkably restrained.

Thus, not only does this Court find no reason to disagree with its well-reasoned conclusions, but,

reviewing the law de novo, reaches the same result.

Lastly, this Court must address a final, and purely procedural and temporal, argument

raised in the Motion for Relief and Motion to Reverse in favor of reversal. For Appellants, the

relevant deadline lies in Rules 8006 or 8009. (Doc. 7 at 1; *see also* Doc. 11 at 2.) As a matter of

law, however, this assertion is wholly incorrect, for both rules touch only upon the designation of

---

[17] Relatedly, this Court finds no merit in the Appellants' attack on the $49,432 award as a
double-charge. The fee applications authorized on October 29, 2015, did not include charges for
defending against two actions and one more complaint. (*See* Doc. 9 at 31–32.) Appellants allege
as much, but they provide no support for this contention. And none can be found by this Court.

additional items to be filed in the record and the record's formal certification for purposes of appellate review. FED. R. BANKR. P. 8006, 8009. Per its explicit text, Rule 8018 controls the deadline for appellee's brief, allowing an appellee thirty days after service of the appellant's brief. FED. R. BANKR. P. 8018(a)(2). Once more, then, Carrolls have filed several motions advocating an argument directly opposed to the explicit laws that this Court must apply.

## IV.    CONCLUSION

By vexatious and abusive conduct, duly shown and fully proved, any debtor may be sanctioned. Often, financial penalties are exacted, but a denial of the right to file another motion (or another petition) without a judge's explicit permission may also be appropriate. True, such a bar denies a debtor easy access to the Code's hallowed fresh start. But, authorized by statute and by a court's judicial character, such sanctions are indispensable to punish and deter behavior inimical to the administration of justice. Here, the Bankruptcy Court relied on well-documented findings of fact and levied sanctions long authorized by this nation's courts. Accordingly, the Bankruptcy Court's Order is hereby AFFIRMED, and the Motion for Relief and Motion to Reverse are DENIED.

Signed in Baton Rouge, Louisiana, on <u>August 2, 2016</u>.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**